# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

No. 12 Cr. 121 (RJS)

---

UNITED STATES OF AMERICA

versus

MICHAEL STEINBERG,

Defendant.

---

MEMORANDUM AND ORDER
May 15, 2014

---

RICHARD J. SULLIVAN, District Judge:

On March 31, 2013, Defendant Michael Steinberg was indicted on one count of conspiracy to commit securities fraud and four counts of securities fraud, all relating to insider trading in Dell, Inc. ("Dell") and NVIDIA Corp. ("NVIDIA") stock from 2007 through 2009. (Doc. No. 230.) On December 18, 2013, after a four-week trial, a jury convicted Defendant on all five counts. Now before the Court is Defendant's motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure. For the reasons set forth below, the motion is denied.

I. BACKGROUND

A. Facts[1]

Defendant, who was a portfolio manager at the hedge fund SAC Capital Advisors ("SAC") (Trial Tr. at 69:10–19), obtained inside information from Dell and NVIDIA

---

[1] The following facts are drawn from the Trial Transcript (Doc. Nos. 334, 336, 338, 340, 342, 344, 346, 348, 350, 352, 354, 357, 359, 361, 363, 365, 367 ("Trial Tr.")) and from the trial exhibits. For purposes of this Memorandum and Order, all facts are stated in the light most favorable to the government. *See United States v. Masotto*, 73 F.3d 1233, 1241 (2d Cir. 1996) (holding that a court reviewing a conviction for sufficiency of the evidence "must credit every inference that could have been drawn in the government's favor" (internal quotation marks omitted)).

through long and convoluted chains of tippers.

For the Dell information, Rob Ray ("Ray"), a Dell employee assigned to the company's investor relations department, tipped confidential Dell information to a friend, Sandeep Goyal ("Goyal"). (Trial Tr. at 3003:3–6, 3014:8–15, 3019:1–3020:1, 3030:11–3034:16.) In exchange, Goyal provided career advice and references to Ray, who hoped to move into the financial industry. (*Id.* at 3015:10–3029:2, 3036:10–19.) Goyal then tipped the information to Jesse Tortora ("Tortora"), a securities analyst, in exchange for money. (*Id.* at 3003:3–6, 3035:9–3036:9, 3037:10–14.) Tortora in turn shared the information with a group of analyst friends as part of a general exchange of securities tips among the friends. (*Id.* at 171:5–172:6, 185:20–186:19.) One of those friends was Jon Horvath ("Horvath") (*id.* at 171:18–20), who worked for Defendant at SAC (*id.* at 882:6–18). Horvath gave the information to Defendant (*id.* at 929:15–930:5), who subsequently earned $1,469,593 for his portfolio by trading in Dell securities (Government Trial Exhibit ("GX") 51; GX 59; GX 2505; GX 2505-C).

The NVIDIA information followed a similar route. Chris Choi ("Choi"), an employee of NVIDIA, tipped confidential NVIDIA information to his family friend Hyung Lim ("Lim") in order to help Lim trade in NVIDIA securities. (Trial Tr. at 3204:22–3205:5, 3217:11–19, 3218:1–3219:1, 3219:18–3220:3.) Lim in turn provided the information to his friend Danny Kuo ("Kuo") (*id.* at 3217:11–21), partly because they were friends and partly in exchange for payments and stock tips (*id.* at 3213:11–14, 3215:23–25, 3227:9–3230:7). Kuo was a member of Tortora's circle of analyst friends (*id.* at 171:18–172:6), and through the circle he shared the information with Horvath (*id.* at 1244:12–13, 1251:17–1253:2). Again, Horvath shared the information with Defendant (*id.* at 1301:13–22), who subsequently earned $349,756 for his portfolio by trading in NVIDIA securities (*id.* at 3299:25–3300:13; GX 81).

B. Procedural Background

Defendant made his Rule 29 motion at the close of the government's case. (Trial Tr. at 3385:24–3387:9.) After hearing arguments from the parties, the Court reserved judgment on the motion. (*Id.* at 3402:4–3411:11.) At Defendant's request, the Court extended the deadline for post-trial briefing until February 3, 2014 (Doc. No. 333), but Defendant ultimately decided not to file any additional submissions.

II. LEGAL STANDARD

A. Rule 29

Rule 29(a) requires the court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Where the court reserves judgment until after the jury returns a verdict, it must still "decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). "A defendant challenging a conviction based on insufficient evidence bears a heavy burden." *United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In this analysis, the court does not assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence. *See*

2

*United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). Further, the court is to apply this test to "the totality of the government's case and not to each element, as each fact may gain color from others." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).

### B. The Elements of Tippee Liability

"To hold [a tippee defendant] criminally liable for insider trading, the government . . . [must] prove each of the following elements beyond a reasonable doubt: (1) the insider-tippers . . . were entrusted the duty to protect confidential information, which (2) they breached by disclosing [the information] to their tippee . . . , who (3) knew of [the tippers'] duty and (4) still used the information to trade a security or further tip the information for [the tippee's] benefit, and finally (5) the insider-tippers benefited in some way from their disclosure." *United States v. Jiau*, 734 F.3d 147, 152–53 (2d Cir. 2013). In cases involving tipping chains, where information is passed along from person to person, "[t]he final tippee must both know or have reason to know that the information was obtained through a breach and trade while in knowing possession of the information." *SEC v. Obus*, 693 F.3d 276, 288 (2d Cir. 2012).[2]

### III. DISCUSSION

Defendant made five specific arguments for acquittal, asserting that no rational jury could find that (A) "the [Dell] tipper [Ray] . . . understood [that the tipped information] would be used for trading in a security" (Trial Tr. at 3404:2–24); (B) Defendant "had knowledge that [Horvath] was getting . . . material nonpublic information obtained in" breach of a fiduciary duty (*id.* at 3403:6–3404:1); (C) Defendant "had any knowledge whatsoever of any benefit paid to any of the tippers alleged to be part of the conspiracy" (*id.* at 3402:9–3403:5); (D) the Dell trade underlying Count Two of the Indictment "w[as] made based on illegal inside information" (*id.* at 3407:11–17); and (E) the NVIDIA trade underlying Count Four of the Indictment was made based on illegal inside information (*id.* at 3407:18–3408:6). The Court addresses each argument in turn.

### A. Tipper's Knowledge of Trading

Under the elements for tippee liability listed above, there is no requirement that the jury find that the *tipper* know or believe that

---

[2] The Court notes that, for the most part, it does not distinguish between precedent addressing the "classical" and "misappropriation" theories of insider trading. *See generally United States v. O'Hagan*, 521 U.S. 642, 651–653 (1997) (describing the two theories). "Under the classical theory of insider trading, a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders." *Obus*, 693 F.3d at 284. The misappropriation theory "targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information." *Id.* Although the differences between the theories will sometimes be relevant – such as to whom the information and trading must be disclosed to avoid breaching a duty, *see id.* at 285 – the general legal analysis is the same under either theory. Indeed, different liability rules for the different theories would be untenable in light of the need for "guiding principle[s] for those whose daily activities must be limited and instructed by the SEC's inside-trading rules." *Dirks v. SEC*, 463 U.S. 646, 664 (1983). As a result, the Second Circuit freely cites classical-theory cases when deciding misappropriation cases, and vice versa. For instance, *Jiau* is a classical-theory case, but it derives its elements from *Obus*, a misappropriation-theory case. *See Jiau*, 734 F.3d at 152–53.

3

the tipped information will be used to trade securities. As the Second Circuit explained in *United States v. Libera*,

> The tipper's knowledge that he or she was breaching a duty to the owner of confidential information suffices to establish the tipper's expectation that the breach will lead to some kind of a misuse of the information. This is so because it may be presumed that the tippee's interest in the [material, nonpublic] information is, in contemporary jargon, not for nothing. To allow a tippee to escape liability solely because the government cannot prove to a jury's satisfaction that the tipper knew exactly what misuse would result from the tipper's wrongdoing would . . . serve no purpose other than to create a loophole for such misuse.

989 F.2d 596, 600 (2d Cir. 1993). The Court therefore rejects Defendant's first argument as a matter of law.

### B. Knowledge of Breach

In order to convict an insider-trading tippee, a jury must find that the tippee knew that the tipper disclosed material, nonpublic information in breach of a duty. *See Dirks v. SEC*, 463 U.S. 646, 661 (1983); *Jiau*, 734 F.3d at 152–53. To determine if sufficient evidence existed to establish that Defendant knew of the tippers' breaches of duty, the Court must first address what a "breach of duty" entails. As discussed below, under Second Circuit precedent, "breach of duty" could refer either to (1) the combination of an unauthorized disclosure of confidential information *and* a benefit to the tipper, or (2) just an unauthorized disclosure, even without personal benefit. Even under the more demanding first definition, the Court finds that there was sufficient evidence to show Defendant's knowledge.

### 1. The Meaning of "Breach"

In *Dirks*, the Supreme Court implied that a breach of duty required both an unauthorized disclosure *and* a benefit to the tipper. *See Dirks*, 463 U.S. at 662 ("Absent some personal gain, there has been no breach of duty . . . ."); *see also United States v. Chestman*, 947 F.2d 551, 575–76 (2d Cir. 1991) (en banc) ("Whether the tip breaches such a fiduciary obligation depends upon whether the tipper receives a direct or indirect personal benefit from the disclosure, such as a pecuniary gain or a reputational benefit that will translate into future earnings." (internal quotation marks omitted)). Several more recent Second Circuit cases, however, have implied that the tipper's "breach of duty" refers solely to the tipper's unauthorized disclosure and does not include the tipper's benefit. In these cases, breach of duty and benefit are treated as distinct elements, each of which must be separately proven for tipper and tippee liability, but only the first of which must be known by the tippee. *See SEC v. Contorinis*, 743 F.3d 296, 311 (2d Cir. 2014) ("In the tipper-tippee situation, the tipper and tippee are concerted actors, jointly engaging in fraudulent activity – the tipper breaches a fiduciary duty by disclosing inside information; the tippee trades on that information, knowing of the breach and without disclosing what he knows; and the tipper obtains 'a direct or indirect personal benefit from the disclosure, such as a pecuniary gain or a reputational benefit that will translate into future earnings.'" (quoting *Dirks*, 463 U.S. at 663)); *Jiau*, 734 F.3d at 152–53 (listing elements including "(2) [the insider-tippers] breached by disclosing [the information] to their tippee" and "(5) the insider-tippers benefited in some way from their

4

disclosure"); *Obus*, 693 F.3d at 289 ("[T]ipper liability requires that (1) the tipper had a duty to keep material non-public information confidential; (2) the tipper breached that duty by intentionally or recklessly relaying the information to a tippee who could use the information in connection with securities trading; and (3) the tipper received a personal benefit from the tip. Tippee liability requires that (1) the tipper breached a duty by tipping confidential information; (2) the tippee knew or had reason to know that the tippee improperly obtained the information (*i.e.*, that the information was obtained through the tipper's breach); and (3) the tippee, while in knowing possession of the material non-public information, used the information by trading or by tipping for his own benefit."). Indeed, there would be no reason for these cases to separately require proof of breach of duty *and* benefit if benefit were necessarily included within breach of duty.

Although an interesting topic in its own right, there is no need to resolve this apparent conflict here. At the trial, the Court defined breach of duty to the jury using the more demanding "disclosure-for-benefit" definition. (*See* Trial Tr. at 3701:18–24 ("[THE COURT:] Now, if you find that Mr. Ray and Mr. Choi had a fiduciary or other relationship of trust and confidence with their employers, then you next must consider whether the government has proven beyond a reasonable doubt that they intentionally breached that duty of trust and confidence *by disclosing material nonpublic information for their own personal benefit*." (emphasis added)); *see also id.* at 3700:12–19 ("[T]he government must prove beyond a reasonable doubt that Rob Ray and Chris Choi had a fiduciary or other relationship of trust and confidence with Dell and Nvidia respectively; that as a result of that relationship, they were entrusted with material nonpublic information with the reasonable expectation that they would keep it confidential *and would not use it for personal benefit.*" (emphasis added)); *id.* at 3701:25–3702:2, 3703:20–25 (defining "benefit" within the breach-of-duty instruction).) As a result, when the jury found Defendant guilty, it necessarily found that he knew the tippers had breached their duties to the companies by "disclosing material nonpublic information for their own personal benefit." (*Id.* at 3701:18–24; *see also id.* at 3704:16–19 ("[THE COURT:] To meet its burden the government must also prove beyond a reasonable doubt that the defendant knew the material nonpublic information had been disclosed by the insider in breach of a duty of trust and confidence.").)[3] For consistency, the Court will adhere to that same definition of breach of duty – unauthorized disclosure for personal benefit – for purposes of this motion.

2. A Rational Jury Could Find That Defendant Knew of the Tippers' Breaches

Under the Court's jury charge, the government had to show beyond a reasonable doubt that Defendant either knew of or was willfully blind to the tippers' breaches of duty.[4] (*See* Trial Tr. at

---

[3] Defendant did not object to this aspect of the Court's instruction on the definition of a breach of duty (*see* Doc. No. 309 at 20–22; Doc. No. 323), which was based on a nearly identical charge used in *United States v. Newman and Chiasson*, 12 Cr. 121 (RJS) (*see* Doc. No. 219 at 4030:19–25).

[4] Willful blindness is a proxy for knowledge. *See United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000). Arguably, however, the jury needed to find only that Defendant knew *or should have known* of the breach. *See United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) ("[A] liable tippee must know that the tipped information is material and non-public . . . and the tippee *knows or should know* that there has been a breach of fiduciary duty." (alterations and emphasis in original) (internal

5

3708:15–3709:12.) A jury can find that a defendant was willfully blind "'where a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge.'" *United States v. Whitman*, No. 13-491-CR, 2014 WL 628143, at *5 (2d Cir. Feb. 19, 2014) (quoting *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003)).

Horvath testified that several times per quarter, every quarter, for seven or eight quarters in a row, he received "nonpublic" "high-level income statement information" about Dell that was "quite accurate, very accurate" and that he knew came from a contact inside Dell. (Trial Tr. 925:16–927:9, 930:4–5.) Horvath stated that he passed on the information to Defendant and that he told Defendant the information came from an insider. (*Id.* at 929:15–930:5; *see also id.* at 412:21–24 ("[TORTORA:] [Horvath] and I have had several conversations that I was sharing information that he gave me to Todd [Newman], and he told me he was sharing information that I gave him to Mike Steinberg.").) Horvath further testified that for five quarters he received "nonpublic" revenues and gross margins information about NVIDIA that was "very, very accurate," was "very important to investors," and came from someone inside Nvidia. (*Id.* at 1300:17–1301:12.) He stated that he also passed this information to Defendant and told him it came from an NVIDIA insider. (*Id.* at 1301:13–22.) In addition, Horvath testified that he could not get information "close" to the Dell information through normal company channels and that he had never heard of anyone getting that kind of information before it was publicly announced. (*Id.* at 987:3–10.) Similarly, with respect to NVIDIA, the government entered into evidence an email from Horvath informing Defendant that NVIDIA had a "firm" policy forbidding disclosure preceding earnings announcements. (GX 957.)

Based on this evidence alone, a rational jury could have found that Defendant either knew or was willfully blind to the fact that the sources inside these companies were making unauthorized disclosures for a personal benefit. The evidence at trial amply demonstrated that Defendant was an experienced investment professional who, a jury could infer, understood what kinds of information are available through legitimate channels and what kinds of information are not. (*Cf.* Trial Tr. at 3033:23–3034:19 (testimony by Goyal that he knew from experience that the type of information he obtained about Dell was not authorized for disclosure); *id.* at 3223:22–3224:7 (testimony by Lim that he knew from experience that the type of information he obtained about NVIDIA was not authorized for disclosure).) A jury could therefore reasonably find that Defendant either knew or was "overwhelmingly suspicious" that information that could not have been obtained through authorized means was in fact received through unauthorized means.

---

quotation marks omitted)); *see also United States v. O'Hagan*, 521 U.S. 642, 675 (1997) ("To show that a tippee who traded on nonpublic information about a tender offer had breached a fiduciary duty would require proof not only that the insider source breached a fiduciary duty, but that the tippee knew or should have known of that breach."); *United States v. Rajaratnam*, 802 F. Supp. 2d 491, 497 n.1 (S.D.N.Y. 2011) (citing cases from other circuit courts); 3 Leonard B. Sand, et al., *Modern Federal Jury Instructions: Criminal*, Instruction 57-15 (2013) ("[The government] also must prove that the defendant knew or should have known that the insider from whom he received the confidential information had violated a trust relationship."). Out of an abundance of caution, the Court applies the higher standard, requiring knowledge or willful blindness.

6

This is especially true given evidence that Defendant was trained to recognize illegal inside information (*id.* at 819:1–18, 821:1–827:6) and evidence that he was alert to the legal implications of insider trading (*see* GX 1204 (email from Defendant observing that an email from Horvath discussing contacts at a company could "wake up some of [SAC's] legal eagles")).

Regarding benefit to the tipper, once a rational jury found that Defendant knew the disclosures were unauthorized, it also could find that Defendant either knew or was overwhelmingly suspicious that the original sources of that valuable information were receiving some benefit in return. A rational jury could come to this conclusion by reasonably inferring that Defendant was savvy enough to understand that there is no such thing as a free lunch. *Cf. Libera*, 989 F.2d at 600 ("[I]t may be presumed that the tippee's interest in the information is, in contemporary jargon, not for nothing."). Here, a rational jury could find that Defendant knew or was willfully blind to the fact that he was (1) repeatedly receiving (2) valuable, material, nonpublic information (3) from a company insider (4) in violation of company policy (5) numerous times each quarter. Given those facts, a rational jury would surely be justified in further concluding that Defendant knew or at least overwhelmingly suspected that personal benefit to the original sources – who were risking their jobs – was somehow involved. Only a Pollyanna could have believed otherwise.

It is of no moment that Defendant might not have known precisely how his tipper-patrons were rewarded. As Judge Rakoff held in *United States v. Whitman*, Defendant needed to know that duties of trust and confidence were breached; he did not need to "know the details." *See* 904 F. Supp. 2d 363, 374 (S.D.N.Y. 2012), *aff'd*, No. 13-491-CR, 2014 WL 628143 (2d Cir. Feb. 19, 2014). Moreover, under *Dirks* and Second Circuit precedent, virtually anything Defendant might have imagined the tipper received – even something as small as Choi's benefit from helping his friend Lim – would qualify as personal benefit. *See Obus*, 693 F.3d at 285 ("[Personal benefit includes] 'reputational benefit' or the benefit one would obtain from simply 'mak[ing] a gift of confidential information to a trading relative or friend.'" (quoting *Dirks*, 463 U.S. at 663–64)).

On the facts presented at trial, a rational jury could find that Defendant knew or was willfully blind to the fact that the tippers breached duties of trust and confidence by disclosing material nonpublic information for their personal benefits. Accordingly, the Court rejects Defendant's second argument.

C. Knowledge of Benefit as a Separate Element

Defendant next argues that the jury was required to find that Defendant, in addition to knowing of the tippers' breach of duty, knew of the tippers' benefit. (*See* Doc. No. 309 at 25–26 (joint proposed jury charge including a request by Defendant to instruct the jury that it was not illegal for Defendant to trade "on tips where he does not know that the information had been disclosed in violation of a duty or confidence, in exchange for a personal benefit to the tipper" (emphasis omitted)); Doc. No. 323 at 3 (letter from Defendant discussing his request to charge the jury that Defendant "must have known *not only* that the alleged material nonpublic information was disclosed in breach of a duty of trust or confidence *but also* must have known that it was disclosed in exchange for a personal benefit to the insider" (emphasis added)).) As noted above, to the extent that knowledge of breach of duty encompasses

7

knowledge of benefit, Defendant seeks to add a redundant and unnecessary element. To the extent that knowledge of breach of duty is distinct from knowledge of benefit, under Second Circuit precedent there is no requirement that the government prove that a defendant knew anything other than that the tippers breached a duty.

Under the elements for tippee liability listed in *Jiau*, for instance, there is a requirement that the tippee knew of the breach, but there is no requirement that the tippee knew of the existence or nature of the benefit. *See Jiau*, 734 F.3d at 152–53 ("To hold [a tippee defendant] criminally liable for insider trading, the government . . . [must] prove each of the following elements beyond a reasonable doubt: (1) the insider-tippers . . . were entrusted the duty to protect confidential information, which (2) they breached by disclosing [the information] to their tippee . . . , who (3) knew of [the tippers'] duty and (4) still used the information to trade a security or further tip the information for [the tippee's] benefit, and finally (5) the insider-tippers benefited in some way from their disclosure."). It is hard to believe that the omission of a standalone knowledge-of-benefit element was accidental, as *Jiau* listed the tippers' breach of a duty and the tippers' receipt of a benefit as two separate elements, and therefore considered them both, but only required the tippee to know of the breach. *See id.* Indeed, the ordering of the elements in *Jiau* and the sentence's grammatical structure – with the benefit element isolated at the end – appear designed to segregate the existence of the tippers' benefit from the tippee's knowledge. *See id.*

Moreover, the absence of knowledge-of-the-benefit as a separate element for tippee liability in *Jiau* cannot be ignored as a one-off occurrence. In fact, for more than two decades, the Second Circuit has repeatedly held that the tippee must know of the tipper's breach but has never required a separate element of the tippee's knowledge of the tipper's benefit. *See, e.g.*, *Contorinis*, 743 F.3d at 311 ("In the tipper-tippee situation, the tipper and tippee are concerted actors, jointly engaging in fraudulent activity – the tipper breaches a fiduciary duty by disclosing inside information; the tippee trades on that information, knowing of the breach and without disclosing what he knows; and the tipper obtains 'a direct or indirect personal benefit from the disclosure, such as a pecuniary gain or a reputational benefit that will translate into future earnings.'" (quoting *Dirks*, 463 U.S. at 663)); *Obus*, 693 F.3d at 289 ("Tippee liability requires that (1) the tipper breached a duty by tipping confidential information; (2) the tippee knew or had reason to know that the tippee improperly obtained the information (*i.e.*, that the information was obtained through the tipper's breach); and (3) the tippee, while in knowing possession of the material non-public information, used the information by trading or by tipping for his own benefit."); *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) (Sotomayor, J.) ("To support a conviction of the tippee defendant, the government was simply required to prove [(1)] a breach by . . . the tipper, of a duty owed to the owner of the misappropriated information, and [(2)] defendant's knowledge that the tipper had breached the duty."); *SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998) (listing elements similar to *Jiau*'s); *Libera*, 989 F.2d at 600 ("[T]he misappropriation theory requires the establishment of two elements: (i) a breach by the tipper of a duty owed to the owner of the nonpublic information; and (ii) the tippee's knowledge that the tipper had breached the duty. We believe these two elements, without more, are sufficient for tippee liability." (citation omitted)); *Chestman*, 947 F.2d at 570 (2d Cir. 1991)

8

("[Conviction of a tippee] required the government to establish two critical elements – [(1)] [the tipper] breached a fiduciary duty . . . and [(2)] [the tippee] knew that [the tipper] had done so.").

Taken together, those cases are indistinguishable from this case. *Chestman*, *Libera*, *Falcone*, and *Jiau*, like this case, are criminal cases. *Jiau* and *Warde*, like this case, are classical-theory cases. *See Jiau*, 734 F.3d at 150; *Warde*, 151 F.3d at 45–46. *Obus*, like this case, involved tipping chains. *See Obus*, 693 F.3d at 288–89. *Warde*, like this case, involved a non-pecuniary benefit to the tipper from tipping. *See Warde*, 151 F.3d at 48–49. To be sure, the Court acknowledges the possibility that the Second Circuit may change course and require a new knowledge-of-benefit element. Until then, however, the Court must follow precedent as it is written. *Cf. Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("[A lower court] should follow the case which directly controls, leaving to [reviewing courts] the prerogative of overruling [their] own decisions.").

Again, if benefit is a necessary sub-element of breach of duty, adding knowledge of benefit as a separate element would serve no purpose. Moreover, as the Court explained above, a rational jury could have found – and under the Court's instructions was required to so find in order to find Defendant's knowledge of the tippers' breach – that Defendant knew of the tippers' benefit. If, on the other hand, benefit is not included within breach of duty, then the Second Circuit has omitted knowledge of the tippers' benefit by the tippee as a distinct element time and time again. The jury was therefore not required to find any knowledge of the tippers' benefits beyond what was necessary to find knowledge of the tippers' breaches. Accordingly, the Court rejects Defendant's third argument.

### D. Nexus Between Illegally Obtained Information and the Count Two Trades

Count Two of the Indictment alleges that Defendant engaged in a short sale of 167,368 shares of Dell common stock on August 18, 2008 based in whole or in part on inside information provided by Horvath. (Doc. No. 230.) Defendant argues that the evidence could not support a finding that that trade was motivated by inside information.

At trial, Horvath testified that he called Defendant and gave him Dell inside information on August 18, 2008. (Trial Tr. at 1052:2–1054:11). The government's evidence showed that Defendant executed the short sale almost immediately after speaking to Horvath. (GX 41 (summary chart showing phone call from Horvath to Steinberg ending at 12:36 p.m. EST on August 18, 2008); GX 2505-C (reflecting short sales of Dell stock executed by Defendant on August 18, 2008 at 12:37 p.m. EST).) Based on that evidence, a jury could reasonably conclude that Horvath's information at least partly motivated Defendant's trade. Accordingly, the Court rejects Defendant's fourth argument.[5]

---

[5] The Court notes that the Second Circuit has recently reiterated that a person is guilty of insider trading if he or she trades in a security while "knowingly in possession of . . . material nonpublic information" relevant to that security. *See United States v. Rajaratnam*, 719 F.3d 139, 159 (2d Cir. 2013). Thus, even if the evidence did not establish that the information partially motivated Defendant's trading – and the Court finds that a jury unquestionably could find that it did – his knowing possession of the information at the time of the trade would still be sufficient to support a conviction. *Id.*

9

E. Nexus Between Illegally Obtained Information and the Count Four Trades

Count Four of the Indictment alleges that Defendant engaged in a swap transaction equivalent to a short sale of 160,000 shares of NVIDIA common stock on May 5, 2009 based in whole or in part on inside information provided by Horvath. (Doc. No. 230.) Defendant argues that the evidence could not support a finding that that trade was motivated by inside information.

At trial, Horvath testified that he received NVIDIA inside information from Kuo on April 27, 2009 that would support a short position in NVIDIA. (Trial Tr. at 1307:10–1311:5.) He testified that he passed on information from Kuo to Defendant and told Defendant in April 2009 that the information came from someone inside NVIDIA. (*Id.* at 1300:17–1301:24.) Further, he testified that in his experience working with Defendant, Defendant would not normally "initiate a position" in a security without consulting with Horvath. (*Id.* at 1316:9–13.) In addition, the government provided evidence that on May 5, 2009, Defendant initiated a short position in NVIDIA stock. (*Id.* at 3299:25–3301:10; GX 76.) Based on that evidence, the jury could reasonably conclude that (1) Defendant consulted with Horvath before engaging in this transaction, (2) Horvath shared the inside information supporting a short position, and (3) the inside information partly motivated Defendant's trading. Accordingly, the Court rejects Defendant's fifth argument.

IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT Defendant's Rule 29 motion for acquittal is DENIED. The Court will proceed with sentencing as previously scheduled on Friday, May 16, 2014 at 11:15 a.m.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: May 15, 2014
New York, New York

\* \* \*

The United States is represented by United States Attorney Preet Bharara and Assistant United States Attorneys Antonia Apps and Harry Chernoff, United States Attorney's Office, One St. Andrew's Plaza, New York, New York 10007.

Defendant is represented by Barry Berke, Eric Tirschwell, Megan Ryan, Robin Wilcox, and Steven Sparling of Kramer Levin Naftalis & Frankel, LLP, 1177 Avenue of the Americas, New York, New York 10036.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/15/14

10